79 N.J. Super. 363 (1963)
191 A.2d 749
THE CITY OF EAST ORANGE AND MAYOR AND CITY COUNCIL OF THE CITY OF EAST ORANGE, PLAINTIFFS-APPELLANTS,
v.
THE BOARD OF WATER COMMISSIONERS, ETC., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1963.
Decided June 4, 1963.
*365 Before Judges CONFORD, GAULKIN and KILKENNY.
*366 Mr. William L. Brach argued the cause for appellants.
Mr. Paul T. Murphy argued the cause for respondents (Messrs. Crummy, Gibbons & O'Neill, attorneys).
The opinion of the court was delivered by GAULKIN, J.A.D.
Plaintiffs (hereafter called East Orange) sue to have an extension of a lease, executed in 1952 and held by defendant East Orange Golf Association (hereafter called the golf club), declared void ab initio, or forfeited because of breach of the conditions of the lease. East Orange's motion for summary judgment was denied, and it appeals pursuant to leave granted.
The second count of the complaint alleges that the extension of the lease is void because it was executed in violation of various laws, the principal allegation being that "[t]he consideration paid for the lease was nominal and therefore constituted a gift of property and a donation of land by The City of East Orange to a private association contrary to the provisions of Article 8, Section 3, Paragraphs 2 and 3 of the Constitution of the State of New Jersey, * * *."
In the other counts the complaint alleges that, if the lease is not void ab initio, "defendant has nevertheless materially breached the conditions, terms and covenants of the said lease insofar as defendant has failed and refused to maintain the said course for the `sole use of the residents of The City of East Orange and their guests' as required under the original lease of March 26, 1925 and, instead, the membership of the defendant association as of August 11, 1961 is composed of 505 members of all classes, of which only 82 are presently residents of East Orange, and that the said course is being maintained and operated for the benefit of the total membership and predominantly thereby for the benefit of non-residents of The City of East Orange."
The complaint says that this was done by the defendant in the following fashion:
*367 "2. Defendant by its by-laws and by the membership application and selection procedure has subjected admission to the club to a rigidly-controlled, highly-selective procedure so that the persons receiving applications can be pre-determined by the club membership and so, in addition, the persons among the applicants selected are those and only those that the membership, acting by and through its committees and boards, desires to be so admitted.
3. The result of the procedures as alleged in the second paragraph is to deprive residents of The City of East Orange generally of access to applications for membership and to discourage and impede all except those deemed `desirable' and `wanted' by the defendant association from either applying or being considered for membership therein.
4. The aforementioned discriminatory process has operated generally against the interests of all of the citizens of The City of East Orange. On information and belief it has operated effectively and completely against certain ethnic and racial groups, particularly against Negro citizens such [so?] that requests from members of that race have been discouraged, diverted or sidetracked with the result that the Association has never entertained an application from a Negro citizen nor on information and belief has it ever had during its thirty-six years of operation a member of that race * * *.
5. The aforementioned practices, procedures and consequences have the effect of depriving a sizeable proportion of the population of The City of East Orange of access and the right to use and enjoy a recreation facility established for the benefit of the citizens of The City of East Orange."
Since we hold that the extension of the lease was void ab initio as an illegal gift to a private corporation, as alleged in the second count, it will not be necessary to go into the facts relating to the other counts except insofar as they pertain to the issue of gift. And, since this is an appeal from the denial of a summary judgment, we shall deal only with the admitted or plainly undeniable facts. Those facts are as follows:
The City of East Orange by action of the city council and of the board of water commissioners entered into a lease dated March 26, 1925, with the golf club, whereby they rented to the golf club approximately 151 acres of land in Millburn, for $1 per year. The underlying purpose of the lease was expressly set forth as part of the original resolution of the city council dated April 13, 1925 as follows:
*368 "WHEREAS, a large group of citizens of The City of East Orange have formed an association for the purpose of encouraging golf and other athletic and recreational activities among the citizens of the City, and have made application to the City for a lease of a portion of the lands now used by the City as a water shed, for the purpose of constructing two or more golf courses and other athletic facilities, and

* * * * * * * *
WHEREAS, the City Council desires to encourage such athletic activities on the part of its citizens and feels it is to the interest of the City to make such lease with the East Orange Golf Association. * * *."
The lease itself contained similar recitals and implemented the expressed intention by requiring the golf club "to build within two years on said lands a golf course of not less than nine holes, and * * * to extend the same to eighteen holes as soon as reasonably possible, and to maintain the said courses for the sole use of the residents of the City of East Orange and their guests."
The lease required the golf club to "maintain and keep the premises in proper condition," and to pay the taxes on the lands in excess of $1,500 per annum, East Orange to pay the initial $1,500.[1] The lease was for ten years with an option in the Golf Club to extend it for an additional ten years which the golf club exercised. The lease provided "that upon the expiration of this lease and its extension, the party of the second part shall turn over to the party of the first part, free and clear of all liabilities, all buildings and other appurtenances erected upon said premises." In case of default, the city had the right of re-entry.
A small additional parcel was added to the premises on January 13, 1927 and a second such parcel on March 28, 1936. On September 26, 1940, almost five years before March 26, 1945, the expiration date of the lease, East Orange extended *369 the lease upon the same terms to March 26, 1955. On June 16, 1952 the extension under attack in this case was executed. It extended the lease for an additional five years, from March 26, 1955 to March 26, 1960, with the further unilateral option in the golf club to again extend the lease to March 26, 1965. The golf club exercised this option on August 13, 1959, and claims the right to remain in the premises on the foregoing terms until March 26, 1965.
The 18-hole golf course was in full operation long prior to 1952. It is admitted that the golf club has paid the rent and the taxes and has adequately maintained the golf course and the buildings thereon. Beginning in 1957 difficulties arose between the golf club and the city about the alleged inability of East Orange residents to become members of the golf club. Those difficulties finally precipitated the institution of this action.
We deem it unnecessary to deal with the validity of any of the instruments executed prior to the extension dated June 16, 1952. On that date East Orange (and/or The Board of Water Commissioners of the City of East Orange; see 73 N.J. Super. 440 (Law Div. 1962)) was the owner of the land and all the improvements thereon (subject only to the golf club's right to possession to March 26, 1955, assuming, but not agreeing, that the previous extensions were valid), including not only the golf course but the buildings also, which cost well over $135,000 at a time when we know costs were lower than in 1952.[2] East Orange rented all this to the golf club in 1952 for five years to commence March 26, 1955, with an option to renew for another five years thereafter, for $1 per year, East Orange to pay the first $1,500 of taxes. On its face, this appears plainly to be a gift, contrary to N.J. Const., Art. VIII, § III, pars. 2 and 3. Jamouneau *370 v. Local Government Board, 6 N.J. 281 (1951); Wilentz v. Hendrickson, 133 N.J. Eq. 447 (Ch. 1943), affirmed 135 N.J. Eq. 244 (E. & A. 1944); Strock v. East Orange, 77 N.J.L. 382 (Sup. Ct. 1909).
To show that it was not, the golf club points to the fact that (1) it was required to pay the taxes over $1,500, which East Orange would have had to pay because East Orange still used the subsoil as a watershed (2) it was obliged to maintain the property, and (3) it spent about $45,000 for capital improvements on the strength of the 1952 extension.
The golf club had to maintain the grounds to exist. The only incidental benefit that East Orange derived from that maintenance is that if the Golf Club vacated the premises, East Orange could use it immediately as a public golf course without spending money to bring the grounds into shape. However, this is the type of incidental benefit that accrues to any landlord from a tenant's good housekeeping, and may not be considered material consideration for the lease. The maintenance of the buildings was also primarily for the benefit of the golf club. Perhaps a greater incidental benefit would percolate down to East Orange by virtue of building maintenance than from the maintenance of the grounds, but that, too, was purely incidental and, as consideration for what was leased, trifling.
The taxes paid by the golf club ranged from $1,707.42 in 1952 to $9,695.44 in 1961. Taking even the highest figure, it was a pittance for occupancy of 151 acres, with such improvements, by a golf club with over 500 members, each of whom paid for membership alone (including tax) $180 per year (family membership, two persons to a family, $300), or $137.50 per year to play weekdays only (family membership $200). The lease of a valuable golf plant like this for defrayal of the bare taxes, with no net return to the owner, is presumptively a gift.
The golf club argues that whether $9,700 per year plus maintenance is adequate consideration to take the transaction *371 out of the category of a gift is a question of fact which must await a trial. We disagree.
It is settled that the receipt of a grossly insufficient benefit by a municipality will not prevent a substantial donation by the public from being considered an unconstitutional gift. Where the alleged consideration is palpably trifling in comparison to what is given for it by the municipality, as it is here, we should so declare without awaiting a trial which cannot possibly change the result. We may not pretend ignorance of that which everyone knows. Borough of Rockaway v. Rockden American Legion Post No. 175, 39 N.J. 504 (1963); Jamouneau v. Local Government Board, supra; Wilentz v. Hendrickson, supra. Cf. Spoerl v. Pennsauken Tp., 14 N.J. 186, 47 A.L.R.2d 1177 (1954).
As the court said in Wilentz v. Hendrickson (133 N.J. Eq., at p. 484), "Courts must always be alert to detect and suppress all evasions of constitutional interdictions. Thus, the determination of the basic questions in the present cause ought not to rest so much upon technicalized reasoning as upon a circumspect and enveloping comprehension of the effect of these statutes."
The following additional quotations from Wilentz v. Hendrickson, 133 N.J. Eq. 447, are apt here:
"* * * The insistence that the appropriation of the public funds to a private enterprise is contractual rather than donative has long been the fashionable plea.
Accordingly, it is expedient to attain a true conception of a consideration which effectually distinguishes an unconstitutional appropriation from a valid contract. It has been said, `Though a peppercorn may be sufficient consideration for a promise, whether or not it is, depends on whether it was in fact the exchange or at least a requested detriment induced by the promise. "Nothing is consideration * * * that is not regarded as such by both parties."' Williston on Contracts § 100, p. 320. The existence of a binding contractual relationship between private parties is not the point to be here determined. The problem here to be solved is whether the * * * [transaction] is in substance, purpose and effect an appropriation constitutionally prohibited. [133 N.J. Eq., at p. 474]

* * * * * * * *
Assuredly, the requisite consideration must be unimagined, substantive and veritable. [133 N.J. Eq., at p. 475]
*372 * * * Patent inadequacy of consideration might be a salient and decisive factual circumstance in resolving whether * * * [the transaction] was in truth enacted in furtherance of a lawful contract, or manifestly in furtherance of a donative purpose prohibited by our constitution. Suppose, hypothetically, a statute purported to transfer one of the large and valuable institutional properties of the state to a private corporation for $10. The supposition is, of course, preposterous, but it serves to expound the relevancy of that bare circumstance in determining whether the proposed transaction was intended to be a sale or a donation. [133 N.J. Eq., at p. 476]

* * * * * * * *
An appropriation, directly or indirectly, by the state to a private corporation founded upon a transaction wherein a sufficient quid pro quo is not easily discoverable and justly ascertainable, is forbidden by * * * of our constitution." (133 N.J. Eq., at p. 479)
Even though he dissented from the opinion of the Court of Errors and Appeals which affirmed Wilentz v. Hendrickson, Justice Case nevertheless said (135 N.J. Eq., at p. 262):
"* * * The Legislature was so limited by the constitutional intervention that it might not make a gift; therefore it could not, under the ruse of consideration, make a contract that was in essence a gift; it could not, as was said of a provision in the New York Constitution prohibiting the granting of extra compensation to a contractor (McGovern v. City of New York, 234 N.Y. 377, 138 N.E. [Rep.] 26 [25 A.L.R. 1442]), call a consideration that which was no consideration at all, or wherein the shred of value, if any, was so disproportionate to the return that to uphold it as sufficient would be to nullify the constitution by subterfuge and fiction. Consequently, if that which is advanced by the legislature as consideration for the contracts with the railroads is clearly subterfuge and fiction, a ruse without substance, the statute which authorizes those contracts is invalid and should be so held; * * *."
In Jamouneau, supra, the City of Newark had leased land to Lefcourt in 1928 for 50 years at a minimum annual rent of $75,000. Pursuant to the terms of the lease, Lefcourt erected an office building. In 1949 the city agreed to accept $750,000 for the fee and the cancellation of the lease. Lefcourt's appraisals were $639,884 and $700,000; the city's, $837,644 and $873,129. The agreement was approved by the Director of the Division of Local Government and, on appeal, by the Local Government Board. The Supreme Court nevertheless analyzed *373 the figures and declared the $750,000 palpably insufficient and the transaction plainly an invalid gift, even though the sale would have returned the property to the tax rolls. One reason given by the Supreme Court which is especially pertinent here was that "[t]he agreed price frankly includes no value for the building at the expiration of the lease period." (6 N.J., at p. 291.)
Here we find "the shred of value, if any, was so disproportionate to the return that to uphold it as sufficient would be to nullify the constitution by subterfuge and fiction."
The golf club argues also that it spent $45,000 on capital improvements which it would not have spent had it not received the 1952 extension. The answer to that is that East Orange did not bargain for any such improvements. Therefore, it was not consideration for the extension, for, as was said in Wilentz v. Hendrickson, supra, at p. 474: "Nothing is consideration * * * that is not regarded as such by both parties." See also Jamouneau, supra, 6 N.J., at p. 293; cf. Anschelewitz v. Belmar, 2 N.J. 178 (1949).
The golf club argues that, even if not consideration, its expenditure of said $45,000, in reliance on the extension, estops East Orange from asserting the invalidity of the lease. We disagree. To begin with, we think such an expenditure cannot, by way of estoppel, validate an invalid gift. Secondly, the bulk of the $45,000 was spent years ago, with the knowledge that the lease would end in March 1965. The record shows that only $1,000 was spent since 1960. In any event, the remaining unamortized portion of the $45,000 is now too small to stay the hand of the court.
Finally, the golf club argues that the original lease was given to it so that it could fulfill a public purpose on behalf of East Orange to provide a recreation facility for its residents, that the depression forced it to take in non-residents; and that since that time it has taken in East Orange residents as rapidly as there have been vacancies and acceptable applicants.
It is not necessary to decide whether the lease would have been valid if made to a corporation which undertook to operate *374 the property as a public golf course, open to all residents of East Orange. The fact of the matter is that in 1952 the golf club was plainly a private club with a limited and restricted membership paying annual dues. Of the 474 members in 1951, only 68 were residents of East Orange (and the situation since then has been no better). This corporation was in no sense an East Orange public golf facility in 1952, if indeed it ever was, and it has not become one since. To such a corporation, operating as this one did, such a lease for such consideration could not legally be made. Strock v. East Orange, 77 N.J.L. 382 (Sup. Ct. 1909).
The golf club argues that the lease and the extension thereof were made by the City of East Orange and the Board of Water Commissioners of the City of East Orange jointly; the board does not challenge the validity of the original lease or any of the extensions, nor does it claim a breach thereof; the board claims the exclusive right to lease these lands, and if the board is correct, the plaintiffs herein have no standing to prosecute the action; in any event, one of two joint owners may not himself sue to cancel or forfeit a lease. The golf club points out that the action mentioned above, reported in 73 N.J. Super. 440, entitled "The City of East Orange v. The Board of Water Commissioners of the City of East Orange," is now on appeal in the Supreme Court, and that at the very least this court should await the outcome of that litigation.
We see no merit in any of these arguments. In the first place, the board of water commissioners is a party defendant to this action, and its answer to the second count leaves it to this court to "adjudicate the applicability or relevancy" of the allegations of that count. In any event, the City of East Orange and the mayor would have the right to challenge this illegal and unconstitutional gift even if the board of water commissioners prevailed in the litigation now pending in the Supreme Court.
In short, summary judgment should have been entered in favor of the plaintiffs, declaring the 1952 extension of the lease void ab initio.
*375 The judgment is accordingly reversed and the case remanded to the Law Division for the entry of an appropriate judgment, with costs.
KILKENNY, J.A.D. (dissenting).
I would affirm the order of the Law Division, denying plaintiffs' motion for summary judgment, essentially for the reasons expressed by Judge Barrett in his opinion. I believe that there are genuine issues of fact, the resolution of which requires a plenary trial. By reason thereof, R.R. 4:58 precludes the grant of a summary judgment. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).
The majority opinion is bottomed upon a finding by my colleagues that the lease in issue, with particular reference to the extension thereof entered into between the City of East Orange and the defendant golf association in 1952, was void ab initio, because it constituted a "donation" of publicly owned land to a private corporation in violation of our 1947 Constitution, Art. VIII, § III, pars. 2 and 3. I agree that a full development of the facts after a trial at which the parties are given an opportunity to present their respective proofs, might ultimately justify such a conclusion, under the doctrine of Jamouneau v. Local Government Board, 6 N.J. 281 (1951). However, the inadequate record before us does not, in my opinion, warrant such an original fact finding by this appellate tribunal at this time.
While we may exercise original jurisdiction whenever necessary for the complete disposition of a matter on appeal, 1947 Const., Art. VI, § V, par. 3, we ought not to do so where, as here, so many vital questions of fact depend for their answers upon a more complete exposition of the facts, and expert testimony based thereon, than will be found in the ex parte affidavits, answers to interrogatories, limited depositions, and conflicting pleadings which constitute the sole record before us. R.R. 4:58 permits a summary judgment only where there is "palpably" no genuine issue of fact. I feel that this is not such a case.
*376 In reaching its conclusion that the lease arrangement between the city and the golf association was a "donation" of publicly owned land to a private corporation, the majority found as a fact that the consideration for the lease extension was "palpably trifling." The record before us does not, in my opinion, so demonstrate "palpably." There was no proof as to what a fair rental would be for this property upon the terms contained in this lease. We know that the lease covers about 151 acres of land which constitute a small part of the East Orange water reserve. From another case pending before us, we are aware that there are about 2,300 acres in this water reserve. I presume that this particular acreage was raw, unimproved land before the defendant association went into possession and converted it into a golf course, at its own expense. The lease is terminable upon six months' notice, if the city decides to give up its use of the land as a water reserve. Moreover, the city has reserved the right to enter upon the land at any time for the purpose of maintaining, repairing, enlarging or improving any pipe lines or power lines and to install new pipe or power lines. Thus, in essence, only the surface of the land is demised, the city retaining control of the subterranean aquifer.
The majority opinion refers to the great cost of creating the golf course and putting the improvements on the land, as against what the golf association now pays for their use. But that cost of over $200,000 was paid entirely by the golf association and all those improvements will inure to the benefit of the city, as provided in the lease, at the expiration of the lease "and its extension." While title to these permanent annexations to the land vested legally in the city, as owner of the land, from the time of their permanent annexation to the land, the city was not entitled to their possession or enjoyment prior to the expiration of defendant's leasehold rights. That time, in my opinion, has not yet arrived, if this lease extension is not a "donation" of publicly owned land.
I agree that the proverbial "peppercorn," or the ancient "one rose annually on the Feast of Michaelmas," technically *377 sufficient to constitute legal consideration for the ordinary contract, will not save a public contract from the constitutional proscription against donations of public properties to individuals or private corporations. I do not differ with my learned associates as to the underlying legal principles. My disagreement is with the ultimate fact finding by the majority that the arrangement herein was a "donation" of publicly owned lands, anterior to and without the benefit of a trial on the merits of that issue. To me, that conclusion is not so manifest as to justify our drawing it on this record and before the defendant has had an opportunity to present its proofs in the normal way.
The original lease of 1925 and the existing 1952 extension, which will expire on March 26, 1965, did not constitute a pure gift of this publicly-owned land. Besides the nominal rental of one dollar a year, the original lease obligated the golf association to create at its own expense an 18-hole golf course, to maintain it, and to pay all land taxes assessed against the property in excess of $1,500 per year. The lease provided that "upon the expiration of this lease and its extension," the lessee would turn over to the city "all buildings and other appurtenances erected upon said premises." The adequacy of that consideration was never challenged.
The 1952 extension is made "subject to all the conditions contained in the agreement of March 26, 1925." The golf association has paid the land taxes in excess of $1,500. This item amounted to almost $9,700 for the year 1961. Between 1952 and 1960 it expended in excess of $45,000 in capital improvements which will enure to the benefit of the city. We do not know what the depreciated value of these improvements will be. Counsel for defendant association stated at oral argument that it would be able to prove that it discussed the matter of these proposed improvements with the city's officials when it was negotiating for the 1952 extension, and would not have made them except in reliance upon the lease extension. Instead, the golf club would have used its money to pay off the balance of its bonded indebtedness, created by the earlier *378 improvements. Whether this evidence would spell out additional consideration for the extension, since the improvements would enure to the benefit of the city, or bring into play the doctrine of estoppel, we do not know without full development of the facts at a trial. A municipality is subject to the doctrine of estoppel. Vogt v. Belmar, 14 N.J. 195 (1954).
The majority opinion makes no disposition of the other contentions made by the city for invalidating the lease, such as its claim of racial discrimination by defendant and of the alleged digression from the original purpose of providing a golf course for residents of East Orange only. In my view, these are serious questions which require full proofs at a trial before a determination as to the proper remedy can be made, if the proofs support the charges. Suffice it to say that defendant has denied any racial discrimination and avers its willingness at all times to give preference to residents of East Orange in passing upon applications for membership. We need not review herein the economic problems of the past which have produced a top-heavy membership in favor of non-residents of East Orange. There has been a long-continued tolerance of this situation by the city during the 38 years defendant has been in possession. Only by a plenary trial can the justice of the entire situation herein be established.
With all due respect for the opinion of the majority, I favor an affirmance of the order denying summary judgment
NOTES
[1] N.J.S.A. 54:4-3.3 provides that municipal water supply lands are subject to taxation by the taxing district where situated "at the taxable value thereof, without regard to any buildings or other improvements thereon, in the same manner and to the same extent as the lands of private persons."
[2] The golf club admitted in answers to interrogatories that the cost of improvements to 1945 was $136,319; to 1955, it was $180,634.17; to 1960, $225,004.34. These costs were depreciated on the books of the golf club to $119,953.27 in 1945, to $144,627.56 in 1955, and to $164,432.33 in 1960.